14292

HICE v. DOBSON LUMBER CO.

(185 S. E., 742)

260

November, 1935.

*Messrs. Price & Poag,* for appellant,

*Messrs. J. Robert Martin* and *J. Robert Martin, Jr.,* for respondent,

May 12, 1936.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

This is an action for damages for injuries sustained by respondent while working for appellant in its planing mill. The complaint alleged negligence and recklessness on the part of appellant: (1) In failing to furnish respondent a safe place to carry on the work required of him; (2) in failing to furnish safe tools and instrumentalities with which to carry on the work required of him; (3) in failing to properly supervise the work as required of plaintiff by it at the time; (4) in failing to select and furnish proper material and instrumentalities by which and on which to carry on the work as directed. The appellant's answer set up a general denial, and the defenses of contributory negligence and assumption of risk. At the conclusion of the testimony for the respondent, a motion for a nonsuit was made on the grounds (a) there is no proof of actionable negligence of any of the allegations of the complaint sufficient to go to the jury, (b) that the only inference to be gathered from the testimony is that respondent fully assumed the risk and appreciated the danger, and without any exceptions to the general rule of assumption of risk, and (c) the only inference to be gathered from the testimony is that respondent was guilty of contributory negligence. This motion was over-

ruled. At the conclusion of all of the testimony, a motion on the same grounds for a directed verdict was made and refused. The jury rendered a verdict in favor of respondent in the sum of $1,000.00.

The case comes to this Court on ten exceptions, which raise but two issues: (1) Should a nonsuit have been granted? (2) Was the appellant entitled to a directed verdict? Thus it becomes necessary to a proper understanding of the case to briefly summarize the testimony.

On January 14, 1931, respondent, who was the foreman of appellant's planing mill, undertook to cut a slit through the center of some small pieces of lumber one inch square and about three feet long, leaving approximately three inches at each end of the pieces unsawed, so that when said pieces of timber were sawed it would continue as a solid piece of wood with a slit cut through the center thereof, and while this work was in progress, the respondent using a ripsaw in the work, suffered the loss of the four fingers at the second joint of his left hand.

Respondent was an experienced planing mill foreman, was forty-five years old, for ten years had been operating a ripsaw, and for six years or more had been foreman of appellant's planing mill department, in which department there was operated two ripsaw machines, two planer machines, and one moulding machine. It was the duty of the respondent to keep in repair all of this machinery and to supervise the operation thereof. The employees of appellant working in the planing mill were directly subject to the orders and directions of respondent, who knew more about the machinery therein, and its operation, than any man connected with the entire plant.

The usual course of business at the lumber plant was that upon an order for lumber being received at the plant of appellant, it was delivered to Mr. A. D. Turner, the yard foreman of appellant; and if the order called for dressed lumber, Turner, as the yard foreman, would get up the required

lumber from the yard, have it placed in the planing mill, and turn the order over to respondent, and it was then left entirely to him to fill the order or as to how the order was filled in that department.

On the said January 14, 1931, an order came into the lumber yard for fifteen or sixteen small pieces of lumber, of the size, and with a slit down the middle as hereinabove described. Respondent testified that he first knew of this order at about 11:30 o'clock in the morning, when Mr. Turner came to him in the planing mill with the pieces of lumber or timber cut into the proper length, and showed him what he wanted done; that he told Mr. Turner it was a job they were not equipped for, but Turner insisted that he do it, and he suggested another way; that is, to use two pieces with a cardboard at each end between it and nail it together; that Turner then said: "No, he had that already cut, and we would get it out of that, and he would help me." Respondent testified he knew it was dangerous to undertake to do this work with the ripsaw.

The only machine in the planing mill which could possibly do the work desired was the ripsaw. In the ordinary operation of this ripsaw, universally known as a dangerous instrument, it was attached to a table or bench, which had a metal top or surface, the saw protruding through a slit in the center thereof. The saw or table through which it protruded was equipped with rollers at either end, which acted as a guard to the operator, in that the rollers caught the timber and fed it through without the operator having to come within four or five feet of the saw. In order to do this particular job, however, the respondent had to make an adjustment on the saw so as to have it projecting about one and a quarter inch above the surface of the metal top, and then raise the rollers several inches so that he could get his hands under the rollers, which in doing the work of cutting a slit in these small pieces of lumber, required him to hold the pieces over the saw with his hands, and this method of

operation brought his hands within a few inches of the exposed saw, revolving at a tremendous rate of speed. After respondent had completed three or more pieces, and while working on another piece, the saw jerked through the wood and his hand came in contact with the saw, resulting in the injury as aforedescribed. Mr. Turner was helping do the work by holding one end of the timber as it got through from under the roller to where he could reach it, and he would hold it until it got back close enough to the roller that he would have to turn it loose. Mr. Turner was holding the timber or piece on which respondent was working at the time of his injury, and respondent testified the timber was jerked back by the saw coming in contact with a rough snarly place, a cross-grain in the timber, thus causing his (respondent's), hand to go into the saw.

We have, in the above brief summary of the testimony, given respondent's version, and this, with all other testimony, must be considered most favorable to respondent. There is some testimony, though very weak, that respondent was subject to the orders of Mr. Turner, and at one place respondent testified Mr. Turner had "commanded" him to do this work. A conclusion will be reached on this theory.

In respondent's brief, in the "statement," is the following:

"There is no contention of any defect in the saw itself. Plaintiff bases his case on the theory that the work at hand was ordered by plaintiff's superior on the spot and was a type of work defendant was unequipped for and done in an emergency, using material and method selected by the Master for this particular job, and with the promise of help from his superior."

We quote from appellant's argument, the following:

"Assumption of risk and contributory negligence were the grounds upon which the motions for nonsuit and directed verdict were made. The ten exceptions merely pre-

sent all of the distinct grounds urged in support of the motions.

"We realize that there is some distinction between the defenses of assumption of risk and contributory negligence. This distinction is either broadened or narrowed under the particular facts of each given case. In this case, however, we think that the facts almost merge the two defenses.

"In the case of *Hall v. Northwestern Railway Company*, 81 S. C., 522, 62 S. E., 848, 850, we find this language:

" 'This is one of that class of cases where, by reason of the allegation that the danger was so obvious and imminent that no prudent servant would have undertaken to make the coupling, the defenses of contributory negligence and assumption of risk approach so closely to each other that distinction between them is almost impossible in the practical application of the law.'

"In the case just cited, the Supreme Court quoted with approval the following extract from the case of *Barksdale v. Railway Company*, 66 S. C., 204, 44 S. E., 743:

" 'In further elaboration of the distinction, it is said in *Barksdale v. C. & W. C. Ry.*, 66 S. C. [204], 211, 44 S. E., 743: "Nearly every case of contributory negligence on the part of an employee involves in a general sense some assumption of risk, because in order to be guilty of contributory negligence there must be the risk of apparent danger. When a servant risks this danger in the discharge of duty imposed on him in the course of usual duty, this would be, in an exact sense, a case of assumption of risk; but if he improperly risks the danger, which becomes a proximate cause of the injury, in doing that which is not imposed on him in the course of his usual duty, it would be contributory negligence." ' "

In the recent case of *Scott v. International Agr. Corp.*, 184 S. E., 133, at page 135 (not yet reported in State Reports), this Court, in discussing assumption of risk, had this to say:

"An employee assumes all of the ordinary risks of his employment; that is to say, he assumes the risk of all dangers ordinarily incident to that employment. He does not, however, assume the risk of extraordinary dangers or dangers caused by the negligence of the employer or its agents and servants, unless those dangers are known to him and appreciated by him, or by the exercise of ordinary care would become known to him and appreciated by him, whether ordinary, extraordinary or however caused. We deem it unnecessary to cite authority for the foregoing statement of the law in this state regarding assumption of risk by an employee.

"We will advert to a further principle of law in connection with assumption of risk. There are certain exceptions. If there is an emergency; if there is a complaint and promise of correction; if the employee acts under the coercion of legal penalties; or if there is a basis for an honest difference of opinion as to safety in using the instrument furnished by the master, or of the manner in performing the work, and the servant surrenders his judgment of unsafety in reliance on the master's superior judgment.

"Assumption of risk is peculiarly a question for the jury, and only in very rare cases should a trial judge direct a nonsuit or direct a verdict in favor of a defendant on this ground, but there are rare cases in which this should be done. See case of *McKinney v. Woodside Cotton Mills,* 167 S. C., 438, 166 S. E., 499."

In the case of *James v. Manufacturing Co.,* 80 S. C., 232, 61 S. E., 391, 393, cited by appellant, this Court gives this definition of assumption of risk:

"Assumption of risk rests in the law of contract, and involves an implied agreement by an employee to assume the risks ordinarily incident to his employment, or a waiver after a full knowledge of an extraordinary risk of his right to hold the employer for a breach of duty in this regard.

*Bodie v. Charleston, etc., Ry. Co.,* 61 S. C., 468, 39 S. E., 715."

The respondent knew the danger of a ripsaw, and had previously suffered the loss of the end of one of the fingers severed. He had been operating a ripsaw for ten years, and when he undertook to operate such a saw without guards, in fact, having in effect removed the guards or rollers, in the ordinary use of the saw, although this was an extraordinary risk, he says in his testimony that he knew it was dangerous, and if he knew it, and according to his own testimony, he knew more about ripsaws than any one else in the entire plant, Mr. Turner not excepted, and proceeded to do the work commanded, then he assumed the risk, unless he can bring himself within one of the exceptions.

We will first consider if respondent surrendered his judgment of unsafety in reliance upon the master's (Turner's), superior judgment. To begin with, respondent admitted he knew more about ripsaws than did Mr. Turner, and he knew it was dangerous to undertake to do the work; that a ripsaw was not the proper tool to do this work, and even if respondent claims to have surrendered his judgment to that of Turner, yet he is met with the insurmountable difficulty that the danger was open and obvious to him and a servant cannot recklessly or carelessly obey an order of his superior requiring him to do an obviously dangerous act.

A case very much in point is *Stephens v. Ry. Co.,* 82 S. C., 542, 64 S. E., 601, 604. In that case the plaintiff, a fireman on the defendant's railroad, was ordered by the engineer, as the train was moving into a station and while it was slowing down, to jump off the moving train, to get the engineer a cup of coffee. The fireman refused twice to jump, but finally, on the basis of the repeated orders of the engineer, did attempt to jump from the moving engine and in so doing was injured. His action was predicated upon an alleged right to recover because of his actions in obedience

upon the engineer's orders to jump from the moving train. After considering at some length the question if the orders of the engineer were within the scope of his authority, the Court had this to say:

"But aside from the company's rules of caution above mentioned, the plaintiff could not stupidly, recklessly, or even carelessly obey an order of the engineer requiring him to do an obviously dangerous act, and hold the defendant responsible for a resulting injury. For in doing so he would be guilty of contributory negligence.

"The remaining inquiry is whether the plaintiff's act was of this character. To show contributory negligence, it is not sufficient that the employee receiving the order should have misgivings and believe the act required to be hazardous, unless the danger is so imminent and obvious that a man of ordinary prudence would not incur it. If there is ground for reasonable difference of opinion as to the danger, the servant is not bound to set up his judgment against that of his superior, whose orders he is required to obey; but he may rely on the judgment of such superior. * * * Here, it is true, the order was given by the engineer; but, even regarding it within the scope of the engineer's authority, there was no emergency, and nothing of consequence to be accomplished, and the plaintiff testified that he regarded the jump from the train so dangerous that he twice refused to take the risk. There was in fact great peril in making the jump, full appreciation of the danger by the plaintiff, who had been in the railroad business a long time, and no exigency or emergency of any kind."

We will next consider if there was an emergency within the contemplation of the exception to the rule in regard to assumption of risk.

The emergency is attempted to be built up around the fact, as testified to by respondent, that Mr. Turner came to him with pieces of timber to be cut into proper lengths at about 11:30 o'clock and stated he was

in a hurry for them; that he wanted to carry them to the store (the order came from Graham's Cash Store), when he went to dinner. The job completed was not worth over $2.00, and the mere fact that, for some reason not shown, Mr. Turner stated he was in a hurry to get the pieces cut would not constitute an emergency within the contemplation of the rule mentioned. The respondent was not under the compulsion of any set of conditions or confronted by serious danger demanding immediate action. There is no testimony whatever in the record that there were any such conditions. The meaning of emergency is given in Webster's New International Dictionary as "an unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency."

As applied to negligence cases, the rule is that when a servant is confronted by a serious danger and has not sufficient time to deliberate upon the comparative safety of alternative courses of action, and the alarm and nervous excitement produced by the situation impairs his reasoning faculties, he is not expected to act with that degree of prudence which would otherwise be obligatory; but the doctrine is not applicable unless the impairment of the servant's mental faculties is excusable under the circumstances, and to excuse acts done it must be made to appear, as a matter of fact, that danger was imminent and adequate to prevent the exercise of sound judgment. 3 Labatt Master & Servant (2d Ed.), § 1274, 20 R. C. L., 135.

It is readily apparent that no testimony offered on behalf of respondent brought him within the rule mentioned.

Respondent also relies upon his testimony that there was a cross-grain or snarl in the timber given him to saw. Upon cross examination, it was shown that respondent did not see any cross-grain or snarl in the piece he was working upon when injured, and it was therefore merely surmise or a guess on his part that there was a snarl or cross-grain therein.

Furthermore, the particular material had been cut and placed in stock under respondent's supervision. He knew that some of the material in stock could be cross-grained, and yet when he undertook this dangerous work, did not even look to see if any of the pieces had a cross-grain or snarl, although an inspection could have been made in an instant, and with his knowledge of timber, if such defect had existed, he would have immediately seen it.

We greatly sympathize with respondent in the loss of his fingers, but under the facts of this case no other reasonable inference can be reached than that respondent assumed the risk, and this is so obvious that it becomes one of those rare cases where a nonsuit and directed verdict should have been granted.

In justice to appellant, although it in no wise affects the conclusion herein reached, it should be stated that respondent's medical and hospital bills were paid by it, respondent was paid his regular salary while incapacitated, and was employed by appellant approximately two years following the accident, when his services were terminated for lack of business.

It is the judgment of this Court that the case be reversed, and that it be remanded to the Circuit Court for Greenville County for entry of judgment in favor of appellant under Rule 27 of this Court.

Mr. Chief Justice Stabler and Messrs. Justices Carter, Bonham and Fishburne concur.